IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

FREDERICK BROOKS,           *

    Plaintiff,          *

       v.              *          CIVIL NO.: WDQ-13-1566

MORTGAGE INVESTORS CORPORATION,   *
    et al.,             *

    Defendants.         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Frederick Brooks sued Mortgage Investors Corporation ("MIC"), Amerigroup Mortgage Corporation ("AMC") (together, the "mortgage defendants"), and Government National Mortgage Association ("Ginnie Mae") (collectively, the "defendants"), for fraud and violating the Maryland Consumer Protection Act ("MCPA").[1]  ECF No. 41.  Pending are the mortgage defendants' motion for summary judgment on all counts, ECF No. 48, and Ginnie Mae's motion for summary judgment on Brooks's request for rescission, ECF No. 47.[2]  No hearing is necessary.  Local Rule 105.6 (D. Md. 2014).  For the following reasons, the mortgage defendants' motion will be denied; Ginnie Mae's motion will be granted.

---

[1] Md. Code Ann., Com. Law § 13-301 et seq. (West 2012).

[2] Alternatively, Ginnie Mae seeks a lien on the subject property. ECF No. 47 at 1.

I.   Background

A.   Facts[3]

On December 16, 2010, Brooks, a Wicomico County, Maryland resident, bought a home located at 29585 Stillwood Drive, Delmar, Maryland (the "Stillwood Drive Home").  ECF No. 48-2 at 10-11.  To buy the Stillwood Drive Home, Brooks obtained a 30-year, $255,000 fixed rate mortgage from Wells Fargo Bank (the "Wells Fargo Loan").  ECF Nos. 41 ¶ 7; 48-2 at 15-17.[4]  With glasses, Brooks was able to see and sign the Wells Fargo Loan documents.  ECF No. 48-2 at 16-17.[5]

---

[3] The facts are from the notice of removal, ECF No. 1, the amended complaint, ECF No. 41, the pending motions, ECF Nos. 47, 48, Brooks's opposition, ECF No. 50, and exhibits attached to the pleadings.  In a motion for summary judgment, the nonmovants' evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[4] The Wells Fargo Loan had a 4.25% interest rate and a $1,254.45 monthly payment.  ECF No. 41 ¶ 7.

[5] In 2001 or 2002, Brooks was diagnosed with cataracts and glaucoma.  ECF No. 48-2 at 35.  Brooks is "functionally and legally vision impaired," and has "received a 100 percent disability rating from the U.S. Department of Veterans Affairs ("VA").  ECF Nos. 41 ¶¶ 1, 2; 48-3 at 2.  Forty percent of his disability rating is from his vision impairment; however, his "overall or combined rating is 100%."  ECF No. 48-3 at 2.  In 2011, Brooks wore thick glasses to see, but he did not use a magnifying glass or reading aid until 2013.  ECF No. 48-2 at 13, 23, 34.

In February 2011,[6] Brooks called the mortgage defendants[7] in response to a "mailed solicitation" that allegedly offered to refinance his Wells Fargo Loan at an interest rate of 2.5%, thereby lowering his monthly payment. ECF Nos. 41 ¶ 8; 48-2 at 18. At that time, Brooks was able to read his mail if he wore glasses. ECF No. 48-2 at 18.

On March 8, 2011, an MIC representative, Marvin Keeling, visited Brooks to discuss the refinancing. ECF Nos. 48-2 at 18; 48-6 at 1. Brooks testified that Keeling told him he could refinance his loan to a "VA guaranteed loan at 2.5 percent . . . fixed . . . for three years." ECF No. 48-2 at 18. After three years, the loan would "go up [one] percent each year [until] it capped off at [five percent]." *Id.* Brooks deferred his decision on refinancing until he received an updated VA disability rating. *Id.* at 19; ECF No. 48-6 at 1.[8]

---

[6] Brooks's amended complaint alleges that he received the solicitation in May 2011; however, he testified that he received the solicitation in February or early March 2011. ECF Nos. 41 ¶ 8; 48-2 at 18.

[7] MIC is an Ohio corporation with its principal place of business in St. Petersburg, Florida. ECF No. 1 ¶ 9. Amerigroup Mortgage Corporation is a division of MIC. *Id.* ¶ 10.

[8] According to Brooks, his niece, a real estate agent, was present at the March 8 meeting, and she "explained to [Brooks] what the terms were." ECF No. 48-2 at 33.

On June 21, 2011, after Brooks had received his VA disability rating, Keeling visited him to review and sign pre-closing documents.  ECF Nos. 48-2 at 20; 48-6 at 1.

Keeling has declared that he offered Brooks a "VA hybrid adjustable rate mortgage," which "had an introductory interest rate of [three percent] for the first three years[,] which would adjust after the first [three] years and could go up or down, but could never go up more than one percent per year[,] and the rate would be capped at a maximum of [eight percent]."  ECF No. 48-6 at 2.  Keeling has also declared that he "reviewed various scenarios with regard to the VA 3/1 hybrid loan being offered by MIC."  *Id.* at 1.[9]  Keeling has further declared that he "never offered or promised Mr. Brooks any other rate or loan product because that was the only loan product offered by MIC at that time."  *Id.* at 2.

During the June 21, 2011 visit, Keeling "prepared and reviewed . . . disclosures, the good faith estimate, Federal Truth in Lending Disclosure[,] and other pre-closing documents,"

---

[9] *See also* ECF No. 48-6 at 6 (Ex. 1 to the Keeling Declaration) (worksheet comparing loan scenarios from 30 months to eight years after refinancing; the first column has "3%" handwritten above the column titled "38 months").  Brooks does not recall reviewing different loan scenarios with Keeling, although he acknowledges that the worksheet bears his signature.  ECF Nos. 48-2 at 21-22; 48-7 at 3-4.

and left copies of each with Brooks.  *Id.*[10]  Among other forms,
Brooks signed: (1) the Truth in Lending Disclosure, which states
that the initial interest rate would be three percent for 38
months, rising to a maximum of eight percent; (2) the Good Faith
Estimate, which states the same basic loan information; (3) the
Maryland Financing Agreement, which documents the interest rate,
and states that the loan is a 3/1 hybrid Adjustable Rate
Mortgage ("ARM"); (4) the Uniform Residential Loan Application,
which states that the interest rate would be three percent for
the first three years; and (5) the VA Hybrid Adjustable Rate
Mortgage Disclosure, which includes a hypothetical monthly
payment schedule based on the above terms.  *See* ECF Nos. 48-2 at
21-22; 48-7 at 3-4; 48-8 at 1, 3, 10, 11, 16, 21.

Brooks testified that, because of his poor eyesight, he
would not have been able to read the pre-closing documents.  *Id.*
at 23.  Even with glasses, he would only have been able to sign
his name, and read large print.  *Id.*  According to Brooks,
Keeling "was supposed to be explaining a lot of the terms and
terminology," and, because Keeling was--like Brooks--a military
veteran, "[he] believed that [he] could trust him."  *Id.*

Brooks gave Keeling a $1,000 good faith deposit.  ECF Nos.
48-2 at 22-23; 48-8 at 8.  Brooks remembered writing the check,

---

[10] Brooks testified that Keeling left documents with him, but he
had not reviewed those documents before closing.  ECF No. 48-2
at 25.

and testified that--in June 2011--he could write checks if he
wore glasses.  ECF No. 48-2 at 23.

On June 29, 2011, Brooks closed on the refinancing loan
offered by MIC ("MIC Loan").  ECF No. 41 ¶ 14.[11]  Brooks admits
that he signed 19 closing documents, including the Adjustable
Rate Note,[12] Deed of Trust, Truth in Lending Disclosure
Statement, HUD-1, Loan Application, and the Notice of Right to
Cancel.[13]  ECF Nos. 48-2 at 21-22, 32; 48-7 at 3-4; 48-9 at 1-2,
5, 21.  However, Brooks testified that "the gentleman pointed to
me and explained to me those documents, and he told me[where to
sign]."  ECF No. 48-2 at 34.

Brooks further alleges that his signature on other
documents had been forged.  ECF No. 41 ¶ 17(g)-(o).  Twenty
documents purportedly signed on June 29, 2011, and later
analyzed by a board-certified forensic examiner, were labeled as

---

[11] Keeling has declared that he did not attend the closing.  ECF
No. 48-6 at 2.  However, Brooks testified that the same MIC
representative visited him on all three occasions.  ECF No. 48-2
at 30-31.

[12] The Adjustable Rate Note indicates that the interest rate
would remain at three percent until October 1, 2014, and that
the interest rate would change every 12 months thereafter.  ECF
No. 48-9 at 5.

[13] Though he signed the notice, Brooks was not verbally informed
of his right to cancel the MIC loan.  ECF No. 48-2 at 32.

6

"[q]uestioned [m]aterial."  ECF No. 50-4 at 1-2.[14]  The examiner
noted "[s]ignificant [d]ifferences"[15] between Brooks's signature
on those documents and known samples of his signature.  *Id*. at
40-58.[16]

    At some time,[17] Brooks's wife "pointed out to [him] what
they had done [to the terms of the MIC Loan]," which "wasn't
exactly what I had agreed to."  ECF No. 48-2 at 27.

    The mortgage defendants sold the loan to Ginnie Mae.  ECF
No. 47-1 at 4; *see also* ECF No. 39-1 at 10.

    B.    Procedural History

    On April 29, 2013, Brooks filed suit in the Circuit Court
for Wicomico County.  ECF No. 2.  On May 30, 2013, the suit was
removed to this Court.  ECF No. 1.  On January 8, 2014, this
Court upheld removal on the basis of diversity jurisdiction.
ECF Nos. 18, 19.[18]

---

[14] One of those documents was the Adjustable Rate Rider.  ECF No.
48-7 at 1.

[15] They include differences in letter formation, the relative
heights of letters, and the terminal stroke of signature, as
well as inconsistent pen lifts.  *See, e.g.*, ECF No. 50-4 at 48.

[16] Although certain closing documents had been notarized,
according to Brooks, no notary public was in his house when he
signed the documents.  ECF No. 48-2 at 31.

[17] The date is not in the record.

[18] The Court dismissed one non-diverse defendant under the
fraudulent joinder doctrine.  *See* ECF No. 18 at 9.

On February 21, 2014, Brooks filed his first amended complaint, adding Freedom Mortgage Corporation ("Freedom") and Ocwen Loan Servicing, LLC ("Ocwen"), as defendants.  ECF No. 24. On March 28, 2014, the Court granted Ocwen's unopposed motion to dismiss.  ECF No. 36.

On June 9, 2014, Ginnie Mae moved to intervene.  ECF No. 39.  On July 1, 2014, Brooks filed a second amended complaint, adding Ginnie Mae as a defendant, and terminating Freedom.  ECF No. 41.[19]  On July 2, 2014, the Court granted Ginnie Mae's unopposed motion to intervene.  ECF No. 43.

On July 22, 2014, Ginnie Mae moved for summary judgment. ECF No. 47.  On July 23, 2014, the mortgage defendants moved for summary judgment.  ECF No. 48.  On August 8, 2014, Brooks opposed Ginnie Mae's motion.  ECF No. 50.  On August 11, 2014, Brooks opposed the mortgage defendants' motion.  ECF No. 51.  On August 25, 2014, Ginnie Mae replied.  ECF No. 52.  On August 28, 2014, the mortgage defendants replied.  ECF No. 53.

---

[19] For both claims, Brooks seeks against all defendants: (1) a judgment declaring the deed of trust and note "null and void and rescinded;" (2) a refund of all monies paid; and (3) costs and attorneys' fees.  ECF No. 41 at 7-8.  For the fraud count, Brooks also seeks $5 million in compensatory damages and $5 million in punitive damages against the mortgage defendants. *Id.* at 8.

## II.  Analysis

### A. Legal Standard for Motion for Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [his] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club,*

---

[20] Federal Rule of Civil Procedure 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

*Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).  The opposing party must produce evidence upon which a reasonable fact finder could rely. *Celotex Corp.*, 477 U.S. at 322-23.  The mere existence of a "scintilla" of evidence is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

 B. The Mortgage Defendants' Motion

 The mortgage defendants seek summary judgment on Brooks's MCPA and fraud claims.  ECF No. 48-1 at 10, 18.

 1. MCPA Claim

 Count One of the second amended complaint alleges that the mortgage defendants told Brooks that MIC would refinance his mortgage at an initial rate of 2.5%, rising to a maximum of 5%. ECF No. 41 ¶¶ 21, 25.  The MCPA prohibits "[u]nfair or deceptive trade practices," including any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers."  Md. Code Ann., Com. Law § 13-301(1) (West 2010).  To prevail on his MCPA claim, Brooks must prove (1) an unfair or deceptive practice or misrepresentation that (2) was relied upon, and (3) caused him actual injury.  *See Stewart v. Bierman,* 859 F. Supp. 2d 754, 768 (D. Md. 2012) (*citing Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 916 A.2d 257, 277 (2007)); Md. Code. Ann., Com. Law

§ 13-408 (providing for a private cause of action).   The

mortgage defendants argue that Brooks has not demonstrated

reliance or injury.   ECF No. 48-1 at 11.

        a.   Reliance

The mortgage defendants assert that Brooks could not have

reasonably relied on an alleged misrepresentation because he was

not functionally disabled in 2011, signed all June 21, 2011 pre-

closing documents, and admits signing certain June 29, 2011

closing documents.   ECF No. 48-1 at 12-13.   Brooks asserts that

"the undisputed facts of forged documents and the disputed facts

of what was told to Mr. Brooks by the MIC agent . . .

[establish] clear issues for the eventual trier of facts."   ECF

No. 51 at 3.[21]

Forgeries[22] that have no bearing on a plaintiff's reliance

are not actionable under the MCPA.   *See Willis v. Bank of Am.*

_____

[21] The remainder of the section in Brooks's opposition titled,
"The Reliance by Mr. Brooks on Representations of MIC's Agent
was Reasonable," rebuts statements in the mortgage defendants'
motion that relate to whether his niece reviewed the terms of
refinancing with him.   *See id.* at 3-4.   MIC had argued that
Brooks could not have reasonably relied on an alleged oral
misrepresentation because his niece was present during the March
8, 2011 meeting, and, thus, was ostensibly available to review
the terms of the MIC Loan contained in the documents Keeling
provided after the June 21, 2011 visit.   *See* ECF Nos. 48-1 at
12; 53 at 3.   Whether his niece reviewed--or could have
reviewed--the loan terms is, at most, tangential to the issue of
reliance.

[22] Despite Brooks's contention that the fact of forgery is
"undisputed," ECF No. 51 at 3, his forensic examiner merely

11

*Corp.*, No. CIV.A. ELH-13-02615, 2014 WL 3829520, at *23 (D. Md. Aug. 1, 2014) (dismissing with prejudice MCPA and fraud claims based on allegedly forged loan documents when plaintiff had failed to show reliance). *Cf. Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796-97 (D. Md. 2013) (misrepresentations made to a state court, and not to plaintiff, were not actionable under the MCPA because plaintiffs had not shown that the "false or misleading statement substantially induced their choice"). That 20 documents contain questionable signatures does not show that Brooks relied on Keeling's alleged misrepresentations. *See Willis,* 2014 WL 3829520, at *23.

However, Brooks asserts that because he "was unable to read the documents he did sign[, he] relied on the mortgage company's agent to tell him what was contained in the documents." ECF No. 51 at 1, 3. The parties do not dispute that Brooks signed the pre-closing forms disclosing the terms of the refinancing. *See* ECF Nos. 48-2 at 21-22; 48-7 at 3-4; 48-8 at 1, 3, 10, 11, 21,

---

described his signature on certain documents as "[q]uestioned [m]aterial," containing "significant differences" from known samples of his signature, ECF No. 50-4 at 1-2, 40-58. It is unclear whether the presence of "[s]ignificant [d]ifferences" means that the signatures were forged, as the forensic examiner never used that term, nor did the examiner state that Brooks did not sign the "questioned" documents. The mortgage defendants assert that Brooks's forgery contention is a "red herring" that has "no bearing on his claims." ECF No. 53 at 9.

16.[23]   The parties also do not dispute that--on June 29, 2011--

Brooks signed 48 closing documents, many of which contained the

terms of the refinancing.   ECF Nos. 48-2 at 21-22, 32; 48-7 at

3-4; 48-9 at 1-2.   Thus, the mortgage defendants argue, Brooks's

reliance on an oral statement that differed from the terms in

the loan documents was not reasonable.   ECF No. 48-1 at 12.

However, "the Maryland Court of Appeals has yet to hold that

*reasonable* reliance is an element of an MCPA misrepresentation

claim[,] despite repeated opportunities to do so."   *Currie v.*

*Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 797 (D. Md. 2013)

(collecting cases) (emphasis added).   Although the mortgage

defendants are correct that, "[a]bsent fraud, duress, or mutual

mistake, a party who signs a contract is presumed to have read

and understood its terms and the party will be bound by them

when that document is executed,"[24] and a person who signs a

contract cannot avoid its terms "on the ground that . . . he

---

[23] Of those, the Good Faith Estimate stated that the initial
interest rate would be 3%, the interest rate could rise to a
maximum of 8%, and the first interest rate change would occur in
38 months.  *Id.* at 1.  The Truth in Lending Disclosure states
the same basic information.  *Id.* at 10.  The VA Hybrid
Adjustable Rate Mortgage Disclosure includes a hypothetical
monthly payment schedule based on those terms.  *Id.* at 16.

[24] *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 678-79 (Md. 2012)
(internal quotations marks, citation, and alterations omitted).

took someone else's word as to what it contained,"[25] those

principles apply to contract actions.  *See* ECF No. 48-1 at 14.

Here, Brooks testified that he was unable to read the June

21, 2011 pre-closing documents, and signed them based on what

Keeling allegedly told him.  ECF Nos. 48-2 at 23; 50-2 at 4.  As

to the closing documents, there is conflicting evidence whether

Keeling--the individual allegedly responsible for the

misrepresentation--attended the June 29, 2011 closing.  *Compare*

ECF No. 48-2 at 30-31 (Keeling did attend), *with* ECF No. 48-6 at

2 (Keeling did not attend).  In any event, Brooks testified that

"the gentleman[26] pointed to me and explained to me those

documents, and he told me[where to sign]."

---

[25] *Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 136 (4th
Cir. 1967) (*citing Maryland Cas. Co. v. Morris Oil Corp.*, 233
F.2d 291, 293 (4th Cir. 1956)); *Cf. Dashiell v. Meeks*, 913 A.2d
10, 20 (Md. 2006) ("It would lead to startling results if a
person, who executes without coercion or undue persuasion, a
solemn release under seal, can subsequently impeach it on the
ground of his own carelessness though at the very time of its
execution he might, had he seen fit, ha[ve] advised himself
fully as to the nature and legal effect of the act he was
doing.")(internal quotation marks and citations omitted);
*Walther v. Sovereign Bank*, 872 A.2d 735, 754 (Md. 2005) ("If
petitioners did not [read the Disclosure Agreement] before they
signed the agreement, they have no persons to blame but
themselves. . . . [W]e are loath to rescind a conspicuous
arbitration agreement that was signed by a party who[] now, for
whatever reason, does not desire to fulfill that agreement.").

[26] Because Brooks testified that Keeling attended all three loan-
related visits, his reference to "the gentleman" is an apparent
reference to Keeling.  *See* ECF Nos. 30, 31, 34.

It is reasonable to infer that, if Brooks was unable to read the pre-closing documents, he would have been unable to read the closing documents signed about a week later, and signed where he was told to.  Viewing the evidence most favorably to Brooks, there is a genuine dispute about whether he relied on an alleged misrepresentation when he closed on the loan.  *See Dennis*, 290 F.3d at 645; *see also Okwa v. Harper*, 757 A.2d 118, 127 (Md. 2000) ("[S]ummary judgment is generally inappropriate when matters such as knowledge, intent, and motive are at issue.").

   b.   Actual Injury

The mortgage defendants assert that Brooks "has suffered no damages" because the interest rate on the MIC Loan was more favorable than the interest rate on the Wells Fargo Loan.  ECF No. 48-1 at 14-16.  The mortgage defendants further assert that "it is a virtual certainty" that Brooks's first interest rate adjustment on October 1, 2014 "will be an adjustment down . . . to an adjusted rate of 2.125%."  *Id*. at 16-17.  The mortgage defendants argue that, even if interest rates then rose considerably, as of September 2016, Brooks will have saved $9,455.76 in monthly payments; taking into account a missed mortgage payment, an escrow refund, and the return of some of his $1,000 earnest money, "Brooks will have some $12,770.05 more in his pocket . . . with the MIC Loan, than he would have had

with his . . . Wells Fargo Loan." *Id.* at 18; *see also* ECF No.
48-11 (Declaration of Thomas J. Carpenter, and an amortization
schedule predicting the first 62 monthly payments under the MIC
Loan).

Brooks asserts that the $11,501.24 in closing costs he
incurred, and that it will take him 69 months to recoup those
costs, establish damages. ECF No. 51 at 5-7. Brooks further
asserts that the figures provided by the mortgage defendants are
mere "assumptions," that the escrow refund was a return of money
he had already paid--"not an out-of-pocket saving"--and, even if
he had not refinanced, Wells Fargo would have refunded the
escrow monies because of his updated disability rating. *Id.* at
5-6.

"[T]o articulate a cognizable injury under the [MCPA], . .
. the consumer must have suffered an identifiable loss, measured
by the amount the consumer spent or lost as a result of his or
her reliance on the sellers' misrepresentation." *Legore v.
OneWest Bank, FSB*, 898 F. Supp. 2d 912, 920 (D. Md. 2012)
(*quoting Lloyd*, 916 A.2d at 277). The mortgage defendants do
not dispute that Brooks incurred $11,501.24 in closing costs;
rather, they attempt to downplay its significance in light of
other savings they predict that Brooks will realize. ECF No.
48-1 at 14-18. Whether the mortgage defendants caused Brooks
actual injury is for a jury to determine. *See Cabeza v. Richey*

*Law & Associates*, No. CIV. WDQ-13-3511, 2014 WL 4635381, at *1

(D. Md. Sept. 16, 2014); *Puryear v. Capital One Bank*, No. RDB-

12-3222, 2014 WL 103506, at *5 (D. Md. Jan. 10, 2014) ("it is a

jury question whether [plaintiff] suffered damages").[27]

Accordingly, the mortgage defendants are not entitled to summary

judgment on the MCPA claim.

    2.   Fraud Claim[28]

Count Two alleges that the mortgage defendants

misrepresented the terms of the refinancing "to deceive [Brooks]

and to induce him to enter into a Variable Rate refinance

program." ECF No. 41 at 7.  Under Maryland law, the elements of

fraud are:

> (1) the defendant made a false representation to the
> plaintiff, (2) the falsity of the representation was
> either known to the defendant or the representation
> was made with reckless indifference to its truth, (3)
> the misrepresentation was made for the purpose of

---

[27] *Cf. Pittway Corp. v. Collins*, 973 A.2d 771, 792 (2009)
("[U]nless the facts admit of but one inference ... the
determination of proximate cause ... is for the jury.").

[28] The mortgage defendants assert that Brooks's opposition does
not address the fraud claim; thus, the Court should consider
that claim conceded and grant summary judgment in their favor.
ECF No. 53 at 7 (*citing* Fed. R. Civ. P. 56(e)(2)).  Rule
56(e)(2) provides that "[i]f a party . . . fails to properly
address another party's assertion of fact as required by Rule
56(c), the court may . . . consider the fact undisputed for
purposes of the motion."  As the MCPA and the fraud claims are
based on the same allegations of fraudulent conduct, which
Brooks discusses in his opposition, and the mortgage defendants
repeat some of the same arguments in their motion, this argument
is unavailing.  See ECF Nos. 41, 48-1 at 12-14, 19-21, 51 at 2-
6.

defrauding the plaintiff, (4) the plaintiff relied on
the misrepresentation and had the right to rely on it,
and (5) the plaintiff suffered compensable injury as a
result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005). "*Ordinarily*

fraud cannot be predicated on statements which are promissory in

their nature, and therefore an action for deceit will not lie

for the unfulfillment of promises . . . ." *Appel v. Hupfield*,

84 A.2d 94, 96 (Md. 1951) (emphasis added). Rather, a contract

action is appropriate. *See id.* However "the defendant's

deliberate misrepresentation of his existing intentions, whe[n]

the misrepresentation was material to the transaction giving

rise to the alleged fraud, may form a basis for an action in

fraud." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*,

665 A.2d 1038, 1048 (Md. 1995). The mortgage defendants argue

that Brooks has not demonstrated that a false representation was

made, that he relied on it, or that he suffered actual damages.

ECF No. 48-1 at 19-20.

As to false representation, Keeling has declared that he

offered Brooks an ARM with a three percent introductory interest

rate for the first three years, adjusting each year, and capped

at eight percent. ECF No. 48-6 at 2. Keeling's declaration is

corroborated by multiple documents reflecting those loan terms.

However, Brooks testified that the mortgage defendants mailed

solicitation and Keeling offered loan terms different from those

on the signed documents.   ECF No. 48-2 at 23, 34.   Although a
party's self-serving affidavits, consisting of "conclusory"
statements lacking objective corroboration, are "not
significantly probative," *Evans v. Techs. Apps. & Serv. Co.*, 80
F.3d 954, 962 (4th Cir. 1996), Brooks's testimony is sufficient
to generate a dispute of material fact as to whether a false
representation was made.[29]

As discussed above,[30] there is a genuine dispute about
whether Brooks relied on an alleged misrepresentation when he
closed on the loan.   Whether that reliance was "reasonable" is a
question for the jury.   *See Nat'l R.R. Passenger Corp. (Amtrak)
v. Ry. Exp., LLC*, No. CIV. WDQ-08-1501, 2011 WL 6187424, at *9
(D. Md. Dec. 1, 2011)("reasonableness . . . is a question of
fact"); *Parker v. Columbia Bank*, 604 A.2d 521, 528 (Md. Ct.
Spec. App. 1992) ("[r]easonable reliance is one of the most
slippery aspects of a fraud case"); *see also Learning Works,*

---

[29] Brooks also contends that "[t]he facts show not just a fraud,
but a forgery," because he did not sign the Adjustable Rate
Rider attached to the Deed of Trust.   ECF No. 51 at 2.   However,
an action to set aside a deed on the basis of forgery differs
from an action alleging that a deed was obtained by fraud.   *See
Lewis v. Snowden*, 105 A.2d 492 (Md. 1954) (on action to set
aside deed, on finding no evidence of forgery, remanding suit to
permit amendment of pleadings to present claim of fraud);
*Rainwater v. Mallas*, 42 F.3d 1386 (4th Cir. 1994)(Table opinion)
(action to set aside a forged deed as a "fraud upon the court"
under Federal Rule of Civil Procedure 60(b)).   Brooks does not
cite authority that the alleged forgery is an element of fraud.

[30] *See supra* section II.B.1.a.

*Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987) (applying Maryland law, and dismissing fraud claim that failed to allege reasonable reliance).  Because, as discussed above,[31] there is a genuine dispute about damages, the mortgage defendants are not entitled to summary judgment on the fraud claim.

    C.   Ginnie Mae's Motion

    Ginnie Mae seeks summary judgment on Brooks's request for rescission of the MIC Loan.  ECF No. 47 at 1.  Because Ginnie Mae incorporated by reference the mortgage defendants' arguments on rescission, ECF No. 47-1 at 6 n.4, their arguments will be jointly considered.

    The defendants contend that rescission of the MIC Loan is improper because Brooks cannot tender the proceeds of the MIC Loan to the current holder, and waited too long to assert his right.  ECF Nos. 47-1 at 6-7; 48-1 at 21-22.[32]  Brooks has not

---

[31] *See supra* section II.B.1.b.

[32] As to timeliness, the defendants argue that Brooks's demand for rescission is barred by the statute of limitations stated in the Truth in Lending Act ("TILA"),15 U.S.C. §§ 1601 *et seq*. However, Brooks's claim for rescission was not brought under the TILA.  Accordingly, the Court will construe the defendants' timeliness argument as it relates to the MCPA and the fraud claim.  *Cf. McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 101 (D. Md. 2010)(applying TILA statute of limitations to claim for rescission under the TILA, and separately deciding MCPA claim); *Boardley v. Household Fin. Corp. III*, No. PWG-12-3009, 2014 WL 4080169, at *10 (D. Md. Aug. 14, 2014)(applying TILA statute of limitations to TILA claim).

directly addressed the defendants' arguments on rescission.  *See*
ECF No. 50.[33]

The right to rescind must be promptly asserted.  *Cutler v.
Sugarman Org., Ltd.*, 596 A.2d 105, 110, 113 (Md. Ct. Spec. App.
1991) (roughly three year delay constituted waiver of right to
rescind).  "This is so because rescission is considered to be a
radical remedy; it therefore must be promptly asserted once a
party discovers facts which justify it."  *Id.* (internal
quotation marks, citation, and alteration omitted).  The party
seeking rescission must act "with reasonable dispatch after it
had either actual knowledge of the fraud or notice of facts
which, in the exercise of due diligence, would have led to
knowledge thereof."  *Goodman v. Poland*, 395 F. Supp. 660, 674
(D. Md. 1975) (*quoting Johns Hopkins University v. Hutton*, 488

---

[33] Nonetheless, Brooks again contends that the Deed of Trust was
the product of forgery, and asserts that although he "does not
dispute the legal analysis submitted by Ginnie Mae with respect
to its claim it is a *bona fide* purchaser," "[i]t is possible
that Ginnie Mae is not a *bona fide* purchaser at all."  ECF No.
50 at 2-3 & n.1 (emphasis added).  However, as discussed above,
*see supra* note 29, Brooks seeks rescission under the theory of
fraud (common law, and under the MCPA); he has not connected his
allegations of forgery to the elements of those claims.
Further, Brooks has not alleged that Ginnie Mae had notice of
the alleged fraud, and, thus was not a *bona fide* purchaser.
Brooks's amended complaint states that "[n]o allegation of
wrongdoing is being made" against Ginnie Mae.  ECF No. 41 ¶ 6.
Brooks is bound by the allegations in his complaint.  *Zachair,
Ltd. v. Driggs*, 965 F. Supp. 741, 752 (D. Md. 1997) *aff'd*, 141
F.3d 1162 (4th Cir. 1998).  In any case, whether Ginnie Mae is a
*bona fide* purchaser has no bearing on whether Brooks properly
exercised his right of rescission.

F.2d 912, 918 (4th Cir. 1973), *cert. denied*, 416 U.S. 916
(1974)).

Although Brooks learned of the alleged fraud when his wife
alerted him to the terms of the MIC Loan, it is unclear when
that happened.  Accordingly, promptness is an issue for the
jury, *see id.* at 674 n. 10 (*citing Johns Hopkins University*, 488
F.2d at 918), and the defendants are not entitled to summary
judgment on that basis.

However, it is well settled that "[r]escission requires . .
. an unconditional willingness to return to the other party both
the consideration that was given and any benefits received."
*Benjamin v. Erk*, 771 A.2d 1106, 1120 (Md. Ct. Spec. App. 2001)
(*quoting Cutler v. Sugarman Org., Ltd.*, 596 A.2d 105 (Md. Ct.
Spec. App. 1991)); *see also Abdel-Malak v. JP Morgan Chase Bank,
N.A.*, 748 F. Supp. 2d 505, 511 (D. Md. 2010)).  Here, Brooks
admits that he cannot tender the loan proceeds that were used to
pay off his Wells Fargo loan.  ECF No. 48-9 at 2.

Further, in Maryland, a "party [allegedly] defrauded has
either a right to retain the contract and collect damages for
its breach, or a right to rescind the contract and recover his
or her own expenditures, *not both*." *Merritt v. Craig*, 746 A.2d
923, 931 (Md. Ct. Spec. App. 2000) (internal quotation marks and

citation omitted)(emphasis added).[34]   As to the MCPA claim,
Brooks seeks rescission and a "refund[]" of "all monies paid to
date."  ECF No. 41 at 7.  As to the fraud claim, Brooks seeks
rescission and $5,000,000 compensatory damages.  *Id.* at 8.  He
is not entitled to both.  *See Meritt*, 746 A.2d at 931.

    Because Brooks cannot tender the funds necessary to obtain
rescission, and as Brooks cannot obtain rescission and damages,
the Court will grant Ginnie Mae's motion for summary judgment.[35]


III. Conclusion

    For the reasons stated above, the mortgage defendants'
motion for summary judgment on the MCPA and fraud claims will be
denied.  Ginnie Mae's motion for summary judgment as to
rescission will be granted.


3/3/15
_____
Date

_____
William D. Quarles, Jr.
United States District Judge

---

[34] *See also Wolin v. Zenith Homes, Inc.*, 146 A.2d 197, 202 (1959)
("These rights were inconsistent and mutually exclusive, and the
discovery put the purchaser to a prompt election.")(*quoting
Telma v. Gingell*, 146 A. 221 (Md. 1929).

[35] Accordingly, the Court need not decide whether Ginnie Mae is
eligible for equitable subrogation.